# EXHIBIT N

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
UNITED STATES OF AMERICA,                         1:17-CR-00664-RJD-RER

     v.

RICHARD LUTHMANN,

                Defendant.
------------------------------------------------------X

### NOTICE AND DECLARATION IN RESERVATION OF RIGHTS OF RICHARD LUTHMANN WITH RESPECT TO EVIDENCE OF UNPRECEDENTED GOVERNMENTAL AND PROSECUTORIAL MISCONDUCT

       RICHARD LUTHMANN, of sound mind and full age, declares the truth of the following under the penalties of perjury:

       1.      I am the *Pro Se* Defendant in the above-captioned matter.

       2.      I am currently under the supervision of the US Probation Office for the Middle District of Florida.  Jurisdiction over my *supervision* was transferred to the US District Court for the Middle District of Florida.  See United States of America v. Luthmann, 2:22-cr-00021-SPC-NPM-1 (M.D.FL).

       3.      This Court retains jurisdiction over the Judgment in my case dated October 23, 2019, passed down by the late Judge Weinstein.  See ECF # 219.

       4.      This NOTICE AND DECLARATION is a reservation of my constitutional and statutory rights based on several essential facts showing extraordinary and unprecedented misconduct, the destruction of evidence, and a cover-up by FBI Special Agent Paul Tambrino, Lead Prosecutrix Moria Kim Penza, and others working on behalf of the Government of the United States.

1

5.      These facts include the litigation currently pending in the US District Court for the Eastern District of New York related to the matter of <u>United States v. Raniere</u>, 18-CR-204 (NGG) (VMS), (E.D.N.Y.), and in the US Court of Appeals for the Second Circuit in the matter of <u>United States v. Raniere</u>, No. 20-3520 (2d Cir. 2022).  I incorporate those proceedings, particularly the Rule 33 arguments and evidence of shocking Governmental, FBI, and Prosecutorial misconduct by reference:

    a. Dr. J. Richard Kiper: "In my 20 years experience with the FBI, I have never seen data manipulation, evidence tampering anything like this on this scale.

    b. Stacey Eldrich: "I worked in the FBI for about 10 years. It is clear that the photos in this case were planted there."

    c. Steve Abrams Esq, cyber lawyer: "This is the most serious tampering of evidence that I've ever seen."

    d. Wayne B. Norris expert witness for digital forensics: "It's inescapable that the FBI proactively created fake evidence."

    e. Stephen Bunting: Computer Forensics expert. "It was changed while in FBI custody, it was changed, it was modified and was altered."

    f. William Odom: "In 25 years of digital forensic investigations, five of which was with the FBI, the amount of technical ability and premeditation to perform this fraud in the case against Mr. Raniere – I've never seen anything like that."

    g. Former US Attorney for the Eastern District of Arkansas, Harry Bud Cummins: "This is more than enough to deem this a matter of high priority…

The FBI should immediately get to the bottom of this. The government should not circle the wagons."

h. Attorney and Harvard University Law School Professor Alan Dershowitz: "Multiple experts have concluded that government tampering of digital photos is, at the very least, a highly likely conclusion. If true, this represents a level of corruption that is so unprecedented, so high, by whoever may be responsible. The current situation is simply untenable. There must be immediate action. There should swiftly be an evidentiary hearing that will determine the truth. Appropriate relief may include…dismissal of the indictment on the basis of outrageous government misconduct.

6.      I was politically railroaded in this case and will get into that more fully in the future. I believe Hillary Clinton, Former Rep. Joe Crowley, Chuck Schumer, Former Rep Michael E. McMahon[1], and others pushed a political contract through the EDNY to "get Luthmann." At the time, I was the Law Chair of the New York State Reform Party, the

---

[1] McMahon became Richmond County, New York (Staten Island) District Attorney on January 1, 2016. Luthmann and his co-defendants Padula and Beck, were all legal objectors and/or political operatives working against McMahon's candidacy, calling attention to a "Lazarus moment," where dead Democrats apparently "arose" to sign his ballot access petition. I guess voting Democrat is one way to ensure "life after death":

> "What is to be noted is that the signatures of seven dead
> people appeared on [McMahon's] petitions. At least five
> living people have signed sworn affidavits that their
> signatures appeared on petitions that they didn't sign.

Rachel Shapiro, STATEN ISLAND ADVANCE (Aug. 06, 2015), available at: https://www.silive.com/opinion/strictly-political/2015/08/call_it_political_fraud_is_a_s.html

now-defunct "Fifth" ballot access line under New York Election Law.  I was a driving force in that party, and if I were not "taken out" by the NYS Democrats with an axe to grind, we would have run a celebrity for Governor on the gubernatorial line in 2018 and kept ballot access.  My indictment crippled that party, as was intended. I was canceled.

7.      I was screwing with the money and patronage of the NYS Democrat and Conservative Parties.  I wasn't a Republican, so the RINOs didn't protect me.   But everyone in NYS politics knew about the Federal Grand Jury, which was supposed to be secret, including NYS Conservative Party Chairman, the very pompous Jerry Kassar.  See the attached **EXHIBIT "A."**  It is concerning that Federal Grand Jury chambers have such "leaky deals."  Maybe the Republican Congress can get to the bottom of this.

8.      I got taken out, in part, for filing a dirty trick of a "Pre-Election Surprise" case against Hillary Clinton.  A week before the November 8, 2016, election, I claimed (truthfully) "Bill Clinton is a rapist" because I defended my client's right to free speech.  See the attached **EXHIBIT "B."**  Bill and Hillary didn't like it.  But if my activities swayed even a few meaningful votes to keep those killers out of the Oval, I consider the four years I spent in the deep state gulag well worth it.   Given a choice and knowing the consequences, I would do it again.  I will not shy away from the front lines in defense of liberty.

9.      I was referred that case by Roger Stone, a Great American and an expert on Government Fuckery himself.  No less prestigious an outlet than New York Magazine reported all about it.  See the attached **EXHIBIT "C."**

10.      I was prosecuted for felony "First Amendment Crimes" and "Election Law Violations" involving satire and free speech. Proceedings are also pending in New York

State Supreme Court *People v. Luthmann*, 2022 N.Y. Slip Op. 67767, (N.Y. App. Div. 2022); *People v. Luthmann*, Index No. 379/2018, (N.Y. Sup. Ct. Rich. Cty.).[2]

11.     Left-wing outlet VICE Magazine covered my Indictment.  Upon information and belief, the story was fed to them by the Prosecutrix, which is part of her *modus operandi*.  **See EXHIBIT "D."** The report contained all of her bogus talking points, including "Better Call Saul" and allegations of "mafia involvement," an "Abbot and Costello routine," which was eventually laughed out of Court by the late Judge Jack B. Weinstein. See the attached **EXHIBIT "E."**

12.     Innocent defendants plead guilty all the time.  I am one of them.  I had a ravenous, career-advancement-hungry Prosecutrix, whom I believe cheated and violated the US Constitution to secure my conviction.  She held all the cards and was looking to put me away for life when I always knew I did nothing wrong.  See USDJ Jed S. Rakoff, Why the Innocent Plead Guilty and the Guilty Go Free:  And Other Paradoxes of Our Broken Legal System (February 16, 2021).

13.     Another basis is reviewing the partial file returned by my attorneys, Arthur Aidala and Mario Romano.  I am still waiting for the remainder of my file. I first asked in

---

[2] In that case, at an August 1, 2018, grand jury proceeding, sitting New York State Supreme Court Justice Ronald Castorina, Jr. committed perjury, suborned by Special Richmond County District Attorney Eric Nelson. Nelson also committed the felony of Unauthorized Practice of Law by knowingly engaging disbarred attorney and federal felon Perry Reich to help illegally circumvent Nelson's duties as legal advisor to the grand jury. A complaint has been filed with the Public Integrity Unit of New York Attorney General Letitia James' Office Submission # 1-419121442. The political nature of this criminal misconduct is unprecedented. The perjury of an NYS Supreme Court Justice and the commission of multiple felonies by a Special Prosecutor to secure a felony conviction could only have been the result of massive political pressure.  I also reserve my rights to allow these proceedings to run their course because they may also produce evidence of misconduct, improper coordination with Federal Authorities, political contracts, or other issues that may be squarely relevant here.

mid-2021.  Romano had a stroke.  I just received a partial copy a few days ago, but some vital items are missing and still need to be transmitted.  See the attached **EXHIBIT "F."**

 **14.** My partial review shows what I believe to be FBI Misconduct by Special Agent Paul Tambrino and others.  Tambrino filed an FBI CHS Reporting Document on February 7, 2018.  The report concerned a meeting with the Government's Star Witness, Guy G. Cardinale, a five-time felony and alleged pedophile.  See the attached **EXHIBIT "G."**

 15. Every other time I met with Cardinale in 2017, the Government had him "wired up" to obtain evidence on their behalf.  This time, the Government's pretext for not having Cardinale "wired up" was that there was a court proceeding that day.  I never even made it into the courtroom or the court building.  I met with Cardinale in the parking lot, conversed, and got into his car.  Once I got into the car, my conversation with Cardinale made the case that the Government was politically contracted to devise against my co-defendants and me nearly impossible to prosecute.  I confronted Cardinale about being a pedophile. We discussed an instance where he asked for my help to fix a situation involving an underage child.  I refused to help him with his sick and criminal endeavors there.  Why would I help him with other illegal activity?  I also confirmed that my co-defendant, George Padula, III, was not a "mobster."   I believe I said Padula was "connected to a fork."

 16. These facts didn't stop the Prosecutrix.  Her express train to career advancement would not be derailed.  These false facts and others were knowingly included in the Indictment until they were laughed out of this Court by the late Judge Weinstein, as described above.

6

17.    I believe that Cardinale was wired up by the FBI that day, but they destroyed the evidence when they heard how devastating the 7-31-2017 conversation was.  I think the Prosecutrix knew all about it. I believe the Prosecutrix knowingly presented false evidence to the Grand Jury to obtain the Indictment in this matter.  The Prosecutrix further proffered false evidence to the Court in my Pretrial Detention Memorandum and throughout these proceedings. Thankfully, for the US Constitution, that woman is no longer employed as a prosecutor.  All you need to know is that in one of her first cases in private practice at a Democrat Party Law Firm, the Prosecutix sued Donald Trump.  See the attached **EXHIBIT "H."**

18.    But the Prosecutrix and FBI Special Agent Paul Tambrino submitted the bogus 2-7-2018 FBI Report once they "legally" eavesdropped on my attorney-client communications and emails while I was warehoused in the Brooklyn Metropolitan Detention Center from December 15, 2017, onward.

19.    In December 2017 and January 2018, I implored Attorneys Aidala and Romano that there was FBI misconduct.  At the very least, the FBI was missing the recording from 7-31-2017 when I knew I had met Cardinale.[3]  Where was it?

20.    I believe that the FBI, in conjunction with the Prosecutrix, engaged in the destruction of evidence.  And further, the bad actors were alerted to the existence of the 7-31-2017 Luthmann recording through the collection of evidence violating the Sixth Amendment right to counsel.

---

[3] Cardinale has never testified under oath in this case and has never been questioned about whether he made a recording on 7-31-2017, or the circumstances around why Special Agent Paul Tambrino magically instructed him not to make a recording on that day when every other meeting in 2017 was "wired up."

21.    My ability to meaningly confer with my attorneys while in the Federal Bureau of Prisons (BOP) custody was nil.  I could not speak freely with Romano or Aidala at the Brooklyn Metropolitan Detention Center (MDC-Brooklyn).  The BOP monitors and saves all telephonic and e-mail conversations and provides copies to the US Attorneys. I was effectively denied any meaningful ability to confer with and understand counsel because no attorney-client privilege exists.  Plus, I believe the Feds bug the attorney meeting rooms.

22.    I was hamstrung from freely expressing myself and intelligently questioning and understanding my legal rights and their ramifications.  See the attached **EXHIBIT "I."**

23.    BOP TRULINCS e-mails do not qualify for the protection of attorney-client privilege. United States v. Mejia, 655 F.3d 126, 133-35 (2d Cir. 2011) (finding that inmate waived attorney-client privilege because the BOP recorded his phone conversation).

24.    In the ten-plus (10+) years since Mejia, the BOP has not improved - all phone calls and electronic communication to attorneys are still not privileged and are recorded and monitored by law enforcement. United States v Asaro, 2014 US Dist LEXIS 97396, at *4 [EDNY July 15, 2014, No. 14-Cr-26 (ARR) ("Certainly, it would be a welcome development for BOP to improve TRULINCS so that attorney-client communications could be easily separated from other e-mails and subject to protection.")

25.    There is also a Due Process concern because the communication intercepts tipped off the Government and the Prosecutrix that there was a gaping gap surrounding the 7-31-2017 conversation that Luthmann was prepared to drive through to an acquittal.  These intercepts were obtained in violation of the Fifth, Sixth, and Ninth Amendments to the United States Constitution.  The attorney-client privilege is a common

law right originally reserved to the people at the time of the ratification of the 1791
Amendments in the Bill of Rights.  The attorney-client privilege is not merely an
evidentiary rule for what the Government may offer before the tribunal.  The Court
severely punished me for mouthing this constitutional challenge (and invoking then-
President Trump) in April 2018.  My bail was revoked, and I was remanded, never to see
the light of day for several years. See the attached **EXHIBIT "J."**[4]  (The Government has
recently demonstrated that it has little respect for the Attorney-Client Privilege…These
are "dangerous" days for lawyer-client relations, according to no less of an authority than
Alan Dershowitz, Professor *Emeritus* of Harvard Law School. (https://bit.ly/2HWY6OH).
And according to President Donald Trump, the United States Chief Law Enforcement
Officer: "Attorney-client privilege is dead!" (https://bit.ly/2KkUIRE).).

26.     If the crime was destroying Cardinale's copy of the 7-31-2017 conversation,
the cover-up and further crime are the bogus 2-7-2018 FBI Report.

27.     My attorneys, Aidala and Romano, have copies of the 7-31-2017
conversation in their possession.  I am still waiting for these copies.  I am patient because
Attorney Romano recently suffered a stroke. I also have to wait for other legal proceedings
to resolve before I can properly make a presentation before this Court.

28.     I also fear that, because of my statements here in the reservation of my
rights, the Stasi/Deep State/FBI will retaliate against me for the temerity of even speaking
of an appeal to the US Constitution for the rights assured to me by the constitutional
republic.

---

[4] In retrospect, the letter wasn't the greatest idea.  But I'm right.

## PLEA AGREEMENTS BASED UPON UNPRECEDENTED
## AND SERIOUS GOVERNMENTAL AND
## PROSECUTORIAL MISCONDUCT

29.    A guilty plea is constitutionally valid only to the extent that it is "voluntary" and "intelligent." Brady v. United States, 397 U.S. 742, 748, 25 L. Ed. 2d 747, 90 S. Ct. 1463 (1970). We have long held that a plea does not qualify as intelligent unless a criminal defendant first receives "real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process." Smith v. O'Grady, 312 U.S. 329, 334, 85 L. Ed. 859, 61 S. Ct. 572 (1941).

30.    A plea of guilty entered by one fully aware of the direct consequences of the plea is voluntary in a constitutional sense "unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e. g. bribes)." Brady at 755.

31.    The Brady rule reinforces the distinct legal and ethical obligations of the Government:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones, It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

10

Berger v. United States, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935); see also Strickler v. Greene, 527 U.S. 263, 281, 119 S. Ct. 1936, 1948 (1999) (discussing how Brady illustrates "special role played by the American prosecutor"); United States v. Rodriguez, 496 F.3d 221, 225 (2d Cir. 2007)(same). These obligations prevent the Government from exploiting its position to obtain an unfair advantage. United States v. Mahaffy, 693 F.3d 113, 134 (2d Cir. 2012) ("Brady violations obscure a trial's truth-seeking function and, in so doing, place criminal defendants at an unfair disadvantage. When the Government impermissibly withholds Brady material, 'its case is much stronger, and the defense case much weaker, than the full facts would suggest.'") (quoting Kyles v. Whitley, 514 U.S. 419, 429, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)) (internal alterations omitted).

32.     The instant circumstances are apparent exceptions to the general rule that a guilty plea generally extinguishes claims of any "antecedent constitutional violation." United States v. Bruce, 488 U.S. 563, 569, 109 S.Ct. 757, 102 L.Ed.2d 927 (1989); Tollett v. Henderson, 411 U.S. 258, 93 S.Ct 1602, 36 L.Ed.2d 235 (1973).

33.     Recent applications of this principle include United States v. Fisher, 711 F.3d 460 (4th Cir. 2013), and Ferrara v. United States, 456 F.3d 278 (1st Cir. 2006). Both Fisher and Ferrera involved egregious governmental conduct.

34.     In Fisher, a DEA Agent lied about the source of information used to obtain a warrant as part of a larger pattern of self-enriching criminal activity. 711 F.3d at 463.

35.     In Ferrera, members of the prosecution knowingly withheld and then manipulated evidence that the defendant had not ordered a murder he pled guilty to committing.  456 F.3d at 281-86.

11

36.     If the <u>Raniere</u> claims are correct and the lead Prosecutrix was aware of FBI creation, fabrication, tampering, and destruction of evidence, the Government would bear the burden of proof as to why the Plea Agreement and the Indictment should not be subject to complete and total *vacatur* <u>with prejudice</u>. The presumption of regularity that attaches to each and every one of her prosecutions (including mine) is lost.

37.     Did the FBI engage in misconduct in my case?  I believe so. And the Prosecutrix knew all about it and encouraged it for her personal career advancement motives.

38.     In the Second Circuit, the Prosecutrix's constructive knowledge extends to those individuals who are "an arm of the prosecutor" or part of the "prosecution team." <u>United States v. Gil</u>, 297 F.3d 93, 106 (2d Cir. 2002); <u>United States v. Morell</u>, 524 F.2d 550, 555 (2d Cir. 1975); <u>United States v. Bin Laden</u>, 397 F. Supp. 2d 465, 481 (S.D.N.Y. 2005). Whether someone is part of the prosecution team depends on the level of interaction between the prosecutor and the agency or individual. See <u>United States v. Locascio</u>, 6 F.3d 924, 949 (2d Cir. 1993); <u>Pina v Henderson</u>, 752 F.2d 47, 49 (2d Cir. 1985) (holding that a prosecutor's constructive knowledge did not extend to a parole officer who "did not work in conjunction with either the police or the prosecutor" but did extend to a police officer who was the investigating officer on the case); Morell, 524 F.2d 550, 555 (2d Cir. 1975); <u>Bin Laden</u>, 397 F. Supp. 2d at 481. Thus, investigating case agents are part of the prosecution team.  <u>Bin Laden</u>, 397 F. Supp. 2d at 481.

39.     FBI Special Agent Paul Tambrino was clearly part of the Prosecutrix's team.

40.     I also wish the Court to take notice of ECF # 239.  My co-defendant, George Padula, III, has previously brought to the Court's attention allegations of the Prosecutrix's misconduct before the Grand jury that rise to the level of violations of the Fifth Amendment's Grand Jury Clause.  I believe that the Indictment against me is fatally flawed by the Government and the Prosecutrix's misconduct, which activity may be criminal and is subject to *vacatur* with prejudice.

## **ACTUAL INNOCENCE**

41.     I am actually innocent of all the charges against me.  The entire indictment was a political contract and "hit-job," instituted by a bent Acting US Attorney seeking to curry political favor for her soft landing into private practice and pressed forward by career-advancement-hungry Prosecutrix, whom I believe cheated and violated the US Constitution to secure my conviction.

42.     The Plea Colloquy also establishes my actual innocence of the Government's charges.  Once the *Raniere* proceedings have run their course, I intend to file a comprehensive motion.  But in short, at the Plea Colloquy and again at Sentencing, the Court accepted an insufficient factual allocution to justify the crimes pleaded to.  Concerning the wire fraud, I stated that I *represented clients who had committed fraud*. I never said I was part of the fraud or made any criminal agreement.

43.     Moreover, the Plea Colloquy does contain a sufficient allocution to the extortionate credit conspiracy.   The Magistrate Judge was even unsure from his statements from the bench.

44.     I reserve the right to address all the issues raised herein upon the resolution of critical issues by the courts.

13

## **Conclusion**

45.     For the reasons stated *supra.*, the Court should respect this NOTICE AND

DECLARATION, reserving my rights.  The Court should consider this pleading when an

appropriate motion is filed for the Court's consideration once the outstanding matters

described above have been resolved.

Dated: Naples, Florida
      January 18, 2023

Respectfully submitted,

Richard Luthmann*

*Signed under penalties of perjury contained in Title 18 of the United States Code.

14

Copyright 2017 by Jed S. Rakoff

Printed in U.S.A.
Vol. 111, No. 6

# WHY PROSECUTORS RULE THE CRIMINAL JUSTICE SYSTEM—AND WHAT CAN BE DONE ABOUT IT

*Jed S. Rakoff*

**ABSTRACT**—Most recognize that federal and state laws imposing high sentences and reducing judicial sentencing discretion have created America's current plague of mass incarceration. Fewer realize that these draconian laws shift sentencing power to prosecutors: defendants fear the immense sentences they face if convicted at trial, and therefore actively engage in the plea bargaining process. This allows prosecutors, rather than judges, to effectively determine the sentences imposed in most cases, which creates significant sentencing discrepancies that most often are unrecorded and cannot be measured. This Essay proposes a solution that would not require legislative change to be put into effect: to have prosecutors occasionally serve as defense counsel for indigent defendants so prosecutors realize the great power they possess. Unfortunately, I recognize that such change is unlikely to happen in the near future, leaving prosecutors in power in the criminal justice system.

**AUTHOR**—U.S. District Judge, S.D.N.Y. This Essay is adapted from a speech given by Judge Rakoff at the Conference on Democratizing Criminal Justice held at the Northwestern University Pritzker School of Law on November 18, 2016.

NORTHWESTERN UNIVERSITY LAW REVIEW

Most prosecutors in the United States are dedicated public servants whose primary aim and satisfaction is to bring criminals to justice. Within the adversary system, however, they represent only one point of view, and under our system of justice, we leave it to neutral players—judges—to resolve competing points of view. Where, instead, when the advocates for one side are given near-total power over the resolution of such disputes, balance is lost and abuses are inevitable. This is what has happened over the past few decades in the United States, with prosecutors increasingly being thrust into the role, not of advocates, but of rulers—with very unfortunate results.

The plea bargain is the ultimate source of this ever-increasing prosecutorial power. It lacks both constitutional and historical grounding; indeed, it barely existed before the Civil War. But thereafter, a combination of circumstances—such as the dislocations following that tragic conflict, the flood of destitute immigrants arriving in the United States in the late nineteenth century, and the increase in effective U.S. police techniques modeled on the "Bobbies" of England—led to prosecutors charging far more persons with criminal offenses than U.S. judges and juries could possibly handle. To deal with this overload, prosecutors increasingly offered criminal defendants the opportunity to plead to lesser charges, and the "plea bargain" was born.[1]

After a while, plea bargaining took on a life of its own. While the Supreme Court initially regarded the practice with some skepticism, by the middle of the twentieth century it had become an accepted feature of the U.S. criminal justice system.[2] In the 1970 case of *North Carolina v. Alford*, the Supreme Court even went so far as to accept as constitutional a defendant's guilty plea to second-degree murder, even when he asserted he was innocent of any murder but was pleading guilty to avoid the likelihood of a conviction of the capital offense of first-degree murder.[3]

Nonetheless, for most of the twentieth century until the 1970s, roughly 15% to 20% of those charged with federal criminal offenses whose cases were not dismissed by the prosecutor still went to trial;[4] and, although the statistics for state jurisdictions are less readily available, they appear to be similar overall.[5] This had a salutary effect: with prosecutors unsure of

---

[1] *See, e.g.*, Albert W. Alschuler, *Plea Bargaining and Its History*, 79 COLUM. L. REV. 1, 10, 19, 25, 34–35 (1979).

[2] *Id.* at 6, 26.

[3] 400 U.S. 25, 37 (1970).

[4] Andrew D. Leipold, *Why Are Federal Judges So Acquittal Prone?*, 83 WASH. U. L. REV. 151, 155 & fig.1, 196–97 (2005).

[5] *See* Marc Galanter, *The Vanishing Trial: An Examination of Trials and Related Matters in Federal and State Courts*, 1 J. EMPIRICAL LEGAL STUD. 459, 460 (2004).

whether a case might go to trial after all, they not only had to be prepared to prove the defendant's guilt beyond a reasonable doubt, but also had to be cognizant that their conduct and the conduct of the police agents might be scrutinized by a court of law in pretrial suppression hearings or during trial itself.

Moreover, throughout most of the twentieth century, the plea bargain served to place a maximum "cap" on the sentence that might be imposed, but otherwise sentencing discretion was left to the judge. For example, when I was a federal prosecutor in the Southern District of New York in the 1970s, the office policy was never to recommend a sentence, but rather to leave the judge unfettered discretion to sentence the defendant anywhere in the typically very broad range between zero and the statutory maximum without any input from the prosecution. In nearby state court, the practice was nominally different—prosecutors would seek advanced judicial approval for a defendant to plead guilty to an offense for which he would be guaranteed a sentence within a specified range. However, the range was typically so broad (e.g., "five to fifteen years") as to still give the judge substantial sentencing discretion.

Material changes to the plea bargaining system occurred after crime rates began to rise dramatically, beginning in the mid-1960s and peaking in 1995.[6] In response to these increased crime rates, Congress and the state legislatures enacted laws that for most crimes imposed much higher sentences and greatly reduced judicial sentencing discretion. These included laws imposing lengthy mandatory minimum sentences (such as five, ten, and twenty years in the case of many drug offenses), laws requiring life sentences and the like for "career offenders" (such as the "three strikes" law in California), and sentencing "guidelines" that in practice dictated severe sentences in most cases (such as the Federal Sentencing Guidelines, which were mandatory before 2005).[7]

The most prominent effect of these laws has been the terrible mass incarceration that continues to plague this country. Currently, 2.2 million people, mostly young men of color, are in jail or prison—far more than in any other country in the world.[8] Another effect has been to cause innocent people to plead guilty in order to avoid the risk that, if they go to trial and

---

[6] *See* Gary LaFree, Book Review, *Explaining the Crime Bust of the 1990s*, 91 J. CRIM. L. & CRIMINOLOGY 269, 270 (2000).

[7] *See, e.g.*, Nathan Greenblatt, *How Mandatory Are Mandatory Minimums? How Judges Can Avoid Imposing Mandatory Minimum Sentences*, 36 AM. J. CRIM. L. 1, 3 (2008); Stephen J. Schulhofer, *Rethinking Mandatory Minimums*, 28 WAKE FOREST L. REV. 199, 199–200, 208, 222 (1993).

[8] *Criminal Justice Facts*, SENTENCING PROJECT (2016), http://www.sentencingproject.org/criminal-justice-facts/ [https://perma.cc/6CAK-GNMN].

NORTHWESTERN UNIVERSITY LAW REVIEW

are convicted on the heavy and multiple charges that prosecutors now typically include in indictments (in part to promote plea bargaining),[9] they will face huge sentences that most judges will have little power or incentive to mitigate. For instance, of the more than 340 convicted felons who, through the work of the Innocence Project, were subsequently exonerated and freed, a full 10% had pleaded guilty to crimes that they were later proved to have never committed.[10]

But a less-noticed effect of these draconian laws has been to shift sentencing power to the prosecutors. Now, under intense pressure to find ways to avoid the immense sentences they will face if they go to trial and are convicted, virtually all defendants—whether innocent or guilty—beg prosecutors to let them plead to reduced charges. The statistics bear witness to this shift. For decades, as noted, 15% to 20% of federal defendants went to trial.[11] But as soon as mandatory minimums and mandatory guidelines took effect in the late 1970s and early 1980s, the percentage began to rapidly decrease: by 2000 only 5% of all federal defendants (reportedly even a smaller percentage of state defendants) went to trial.[12] In 2015, only 2.9% of federal defendants went to trial, and, although the state statistics are still being gathered, it may be as low as less than 2%.[13] These tiny percentages have remained relatively constant in the 2000s even though crime rates have steadily and dramatically declined since 1996, so that the system can no longer claim to be "overloaded."

The net result is that prosecutors, rather than judges, now effectively determine the sentences to be imposed in most cases. They do this in plea bargains hammered out in the prosecutors' offices in unrecorded conversations with defense counsel—sessions in which, because of the pressure on defendants to reduce their sentencing exposure, the prosecutors effectively hold most of the cards. Furthermore, not only are these sessions secret, one-sided, and lacking judicial oversight, but also the results vary materially from prosecutor to prosecutor. Thus, the sentencing

---

[9] Kyle Graham, *Overcharging*, 11 OHIO ST. J. CRIM. L. 701, 701 (2014).

[10] *DNA Exonerations in the United States*, INNOCENCE PROJECT (2016), http://www.innocenceproject.org/dna-exonerations-in-the-united-states/ [https://perma.cc/R8XL-H2JL].

[11] *See supra* note 4 and accompanying text.

[12] BUREAU OF JUSTICE STATISTICS, COMPENDIUM OF BUREAU OF JUSTICE STATISTICS, 2000, at 53 (2002), https://www.bjs.gov/content/pub/pdf/cfjs00.pdf [https://perma.cc/5MC8-FP7J]; *see* MATTHEW R. DUROSE & PATRICK A. LANGAN, BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, FELONY SENTENCES IN STATE COURTS, 2000, at 9 tbl.10, 10 (2003), https://www.bjs.gov/content/pub/pdf/fssc00.pdf [https://perma.cc/W9NR-GV2E]. The corresponding 5% trial rate for state defendants only included defendants charged with a felony.

[13] U.S. SENTENCING COMM'N, OVERVIEW OF FEDERAL CRIMINAL CASES—FISCAL YEAR 2015, at 4 (2016), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/FY15_Overview_Federal_Criminal_Cases.pdf [https://perma.cc/279K-YXHM].

discrepancies (i.e., substantially different sentences for the same crime) that the statutory sentencing guidelines were intended to reduce still occur. Even more troubling is that without oversight, no one can even begin to measure the extent of such discrepancy.

What can be done about this unfortunate shift of power from judges to prosecutors, that is, from neutrals to advocates? The most obvious, and best, solution would be a repeal of mandatory minimum and career offender laws (something the federal judiciary has requested for several decades) and a considerable reduction in the sentences "recommended" by sentencing guidelines. But although a growing recognition of the costs and evils of mass incarceration has fostered some bipartisan efforts in this direction, it appears unlikely to command the support of the new federal administration or of the many state legislatures whose members know that it is still good politics to be "tough on crime." Moreover, even if U.S. sentences were made considerably less draconian than current laws require them to be, it is unlikely that prosecutors, having now realized the power that plea bargaining gives them to effectively determine sentences, would voluntarily relinquish that power in circumstances where the sentences were less severe.

So, what about doing away with plea bargaining altogether? This, in fact, is the status quo in many European countries. In Germany, for example, where plea bargains are officially not recognized (though they do occur, sub rosa, in a few cases), roughly 50% of all criminal cases go to trial, and most of the remaining cases are resolved through de facto pleas to the initial charges.[14] Unfortunately, the plea bargain system is now so embedded in the American criminal justice system that, notwithstanding the great decrease in crime since 1995 mitigating the practical need for plea bargaining, there does not appear to be any vocal support for doing away with plea bargains altogether.

Some more modest, halfway measures have been suggested. Years ago, the late Professor James Vorenberg of Harvard Law School suggested that the Department of Justice promulgate binding regulations, similar to those enacted by administrative agencies, that would govern plea

---

[14] Erik Luna & Marianne Wade, *Prosecutors as Judges*, 67 WASH. & LEE L. REV. 1413, 1532 (2010); Cornelius Nestler, *Sentencing in Germany*, 7 Buff. Crim. L. Rev. 109, 116 (2003) ("[I]n roughly 50% of all cases the prosecution acts on the basis of the assumption that there is sufficient reason to believe that a crime was committed; in these cases, the prosecutors then decide either to bring about an indictment in court, to apply in writing for a penal order, or to conclude the cases according to sections 153 and 153a of the Procedural Code that allow for a termination of the proceedings by the prosecutor.").

bargaining in the federal government.[15] Yet, when Vorenberg himself became Director of the Justice Department's Office of Criminal Justice in the Kennedy Administration—a position in which he was supposed to promulgate major policy initiatives—he was unable to get anyone to back his proposal. Aside from the fact that most of the criminal justice system is administered by the states, Vorenberg's proposal encountered opposition based on the concern that administrative oversight of federal plea bargaining would create satellite litigation that would hamper the speed with which criminal defendants were brought to trial—always a key aim of any criminal justice system that aspires to meaningful deterrence.[16] That same objection could rightly be made today.

In a more recent variation on Vorenberg's proposal, Professor Stephanos Bibas has proposed that various prosecutorial agencies, state and federal, each adopt some internal guidelines that, while not enforceable by outside parties, would nevertheless bring some order to prosecutors' exercise of discretion in the plea bargaining process.[17] Although I admire Professor Bibas, I am skeptical that this would have much effect. When I was a young prosecutor, there stood on my bookshelf a multi-volume work of the then-existing internal rules for federal prosecutors entitled the "U.S. Attorneys Manual." I never opened it, and I don't think any of my colleagues did either. We learned what the "rules" were from our more senior colleagues; and if what they told us was wrong or misguided, there was no one—individual or agency—to correct them. I suspect this is still the case. Moreover, only the prosecutor assigned to a case really knows the evidence in the case; and if the prosecutor wanted to apply any putative internal plea bargain guidelines so as to fit the result she desired (whether harsh or lenient, depending on her personality and ideology), she could easily interpret the evidence so as to fit her disposition, and no chief would know enough to say her nay. When not put to the test of the adversary system, evidence is almost always "flexible" in this way.

Two years ago, in an essay in the *New York Review of Books*, I proposed a variation on what is sometimes referred to as a "preliminary hearing."[18] Specifically, in my formulation, the prosecutor and defense

---

[15] *See* James Vorenberg, *Decent Restraint of Prosecutorial Power*, 94 HARV. L. REV. 1521, 1562–65 (1981).

[16] *See, e.g.*, Rachel E. Barkow, *Institutional Design and the Policing of Prosecutors: Lessons from Administrative Law*, 61 STAN. L. REV. 869, 912 (2009).

[17] *See, e.g.*, Stephanos Bibas, *Transparency and Participation in Criminal Procedure*, 81 N.Y.U. L. REV. 911, 957 (2006).

[18] Jed S. Rakoff, *Why Innocent People Plead Guilty*, N.Y. REV. BOOKS (2014), http://www.nybooks.com/articles/2014/11/20/why-innocent-people-plead-guilty/ [https://perma.cc/8DRB-2GWA].

1434

counsel would be required to appear shortly after indictment before a judicial officer, who would separately question them, in camera and under seal, as to what their evidence was, what discovery they would likely have, and what disposition they were seeking. The judicial officer, without revealing any of this information to the other side or to the judge who would be assigned to the case for all other purposes, would then recommend to the parties what leads still needed to be explored, what disclosures needed to be made, and, where appropriate, what the judicial officer thought would be a fair disposition of the case. In other words, the judicial officer would, in effect, oversee the plea bargaining process and, while not having the power to force either side to his view, could use her persuasive powers to assure a fairer, more neutral process.

A variation on this proposal is currently in practice in the State of Connecticut and has achieved good reviews from prosecutors and defense counsel alike.[19] Nevertheless, it is currently forbidden by the Federal Rules of Criminal Procedure. Moreover, when I tried to persuade my immediate colleagues to try a pilot variation that could be done, on consent of all involved, even under the prevailing rules, I was met with strong resistance—the primary objection being that such an early involvement in the criminal process would compromise judicial neutrality. This objection ignores the fact that the bulk of action in the current federal criminal process occurs during the plea bargaining stage. For a judge to not get involved at that stage is to guarantee, in effect, no meaningful judicial involvement in the process at all. Nevertheless, I accept that this proposal is not proving to be attractive.

Finally, I come back to a very modest proposal that I first made in 1976—only to have it immediately shot down by the country's most prominent prosecutor. The occasion was the visit of then-Attorney General of the United States, Edward H. Levi, to the U.S. Attorney's Office in Manhattan, following his single-handed restoration of order and neutrality to the Department of Justice in the wake of Watergate. After an inspiring speech, Levi entertained questions, and I asked him whether, in order to make prosecutors more conscious of their obligation to do justice rather than just secure convictions, it might be a good idea to have prosecutors occasionally serve as defense counsel—a practice permitted in the United Kingdom. Showing that he was still a "Paper Chase" law professor at heart, Levi responded: "That's not a wholly bad idea, not *wholly* bad!" I slunk away in shame.

---

[19] *See* Jenia Iontcheva Turner, *Judicial Participation in Plea Negotiations: A Comparative View,* 54 AM. J. COMP. L. 199, 247–56 (2006).

NORTHWESTERN UNIVERSITY LAW REVIEW

Nevertheless, I am now shameless enough to think it is a good idea. Under my plan, state and federal prosecutors would be required to spend six months out of every three years of their term (three years is the minimum term required of most federal prosecutors) serving as defense counsel for indigent defendants, with the defendants' consent and subject to the supervision of the local legal aid supervisor. In some cases, to avoid conflicts, the prosecutor in one locale might serve his time as defense counsel in another locale. I can think of no other step more likely to make prosecutors aware of the great power they possess or the need to temper it with other considerations.

I do not believe that this last proposal would require any legislative change to be put into effect, though it would, of course, require the consent of both prosecutorial and legal aid offices. (Many legal aid offices, for reasons that will not bear scrutiny, will never hire former prosecutors as legal aid lawyers, even though the reverse is not true.) Unfortunately, I am also quite confident that the idea is too great a departure from existing U.S. practice to meet with quick approval.

So I end with the not very optimistic conclusion that, for the immediate future at least, prosecutors, rather than judges, will be the real rulers of the American criminal justice system. And I ask you: is that fair?