FILED

**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA**

2023 FEB -9  AM 11: 23

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS, FLORIDA

---

UNITED STATES OF AMERICA,                                    2:22-cr-0021-SPC-NPM

      -against-

RICHARD LUTHMANN,

              Defendant.

---

## MEMORANDUM OF LAW IN SUPPORT OF MOTION

      RICHARD LUTHMANN, Defendant *Pro Se* herein, submits this Memorandum of Law in support of an Order:

A) Declaring the substantive law of the United States Court of Appeals for the Second Circuit applies to this matter; and

B) Terminating Defendant's term of supervised release under 18 U.S.C. § 3583(e)(1); or in the alternative

C) Reducing Defendant's term of supervised release; and

D) Modifying the terms of Defendant's supervised release to remove legal disabilities to employment Defendant is physically, mentally, and emotionally capable of; and

E) Modifying the terms of Defendant's supervised release to allow for unrestricted travel within the United States; and

F) Specifically allowing travel to Chicago, Illinois, from March 17 to 23, 2023, and travel to the Southern District of Florida as needed; and

G) Modifying the terms of Defendant's supervised release so he may effectively practice journalism; and

1

H) Modifying the terms of supervised release so he may take prospective employment as a legal researcher/assistant with a law firm; and

I) For such other and further relief as this Honorable Court may deem just or equitable.

## PRELIMINARY STATEMENT

Defendant Richard Luthmann ("Luthmann" or "Defendant") seeks to have his term of supervised release under 18 U.S.C. § 3583(e)(1). Mr. Luthmann has been on supervised release since August 5, 2021, greater than one (1) year. Mr. Luthmann's continued supervision serves no penological value or is outweighed by the penological value of ending his term of supervised release.

## FACTS

### Case Background

In December 2017, Mr. Luthmann was arrested and indicted on 11 felony counts in the United States District Court, Eastern District of New York.

In September 2019, Mr. Luthmann pleaded guilty to conspiracy to commit fraud and extortionate collection of credit before the late U.S. District Court Judge Jack B. Weinstein. United States v. Luthmann, 17-CR-664, 2 (E.D.N.Y. Oct. 15, 2019) (see "Statement of Reasons" attached as **EXHIBIT "A."**).

At sentencing, the Court specifically stated:

> "It is not lost on the court that Defendant suffers from substance abuse and mental health issues and was under the extreme pressure that is common among lawyers. Stigma and under-resourced programs no doubt contributed to his wariness of obtaining intensive necessary assistance dealing with these problems." *Id.* at 13

Luthmann was sentenced to 48 months incarceration, followed by three years supervised release." *Id.,* see the Judgment attached as **EXHIBIT "B."**

**Luthmann's Term of Incarceration**

Luthmann's incarceration was markedly much more difficult than normal. Luthmann was custodied at the Brooklyn Metropolitan Detention Center, in Brooklyn, New York, in January and February 2019. The Bureau of Prisons (BOP) facility had no heat, electricity, or hot water during an arctic freeze lasting several weeks, garnering international news coverage. See the attached **EXHIBIT "C."** Luthmann suffers from diabetes, obesity, hypolipidemia, obstructive sleep apnea, and severe orthopedic problems and went for weeks without using a C-PAP machine.

Luthmann was moved to Low-Security Correctional Institution – Allenwood, in White Deer, Pennsylvania. Almost the entire time Luthmann was housed there, the facility was under strict Covid-19 protocols. See the attached **EXHIBIT "D."** As noted by many courts, a day of incarceration under these circumstances is far more punishing than a day under normal circumstances, particularly given my serious underlying health conditions and the harsh prison conditions imposed to avoid contracting COVID-19. The pandemic rendered Luthmann's sentence far harsher and more punitive than the court had anticipated at sentencing. See United States v. Rodriguez, 2020 U.S. Dist. LEXIS 18100, 00 CR. 761(JSR) (S.D.N.Y. Sept. 30, 2020); United States v. Simon, 18 CR. 390 (PAE), Dkt. 507, at 5-9, 2020 U.S. Dist LEXIS 155914 (S.D.N.Y Aug. 27, 2020); United States v. Knox, No. 15 CR. 445(PAE), Dkt. 1088 at 2-4, 2020 U.S. Dist LEXIS 62684 (S.D.N.Y. Apr. 10, 2020); United States v. Hernandez, 451 F.Supp.3d 201, 303 (S.D.N.Y. 2020); United States v. Bergman, No.15 CR. 445(PAE), Dkt. 1144 at 6-7, 2020 U.S. Dist. LEXIS 168644 (S.D.N.Y. Sep. 15, 2020); United States v. Lizardi, No. 11 CR 1032(PAE), Dkt. 2523 at 2, 2020 U.S. Dist. LEXIS 188147 (S.D.N.Y. Oct. 9, 2020).

Additionally, the US Supreme Court has called for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant. Davis v. Ayala, 135 S.Ct. 2187, 2209 (2015) (Kennedy, J., concurring).

SHU confinement violates international law norms, and the Mandela Rules and causes irreparable and permanent harm after as few as fifteen (15) days. Luthmann spent two months in the SHU at LSCI-Allenwood on unfounded charges, which were ultimately dismissed. Luthmann wrote about his experiences for the Frank Report. See the attached **EXHIBIT "E."**

**Release From Federal Custody**

Luthmann was released from federal prison to the custody of the Salvation Army Fort Myers halfway house in April 2021. Immediately upon arriving, Luthmann was given a work waiver because of his physical, mental, and emotional conditions. Within a week, Luthmann was released to home confinement on an ankle monitor primarily due to these health concerns.

Luthmann is morbidly obese with two total hip replacements. He has the physiological body of a 77-year-old. Luthmann suffers from diabetes, obesity, hypolipidemia, obstructive sleep apnea, and severe orthopedic problems.

Luthmann was 260 pounds on the day of his arrest on December 15, 2017. After the stress of the indictment and three months of captivity, Luthmann ballooned up to 300 pounds. He was pre-diabetic with an A1C of 5.3. Within three months, he was a full-blown diabetic with an A1C of over 7.0 and remained at that level or higher for his entire BOP term of incarceration.

When Luthmann left prison, he was 340 pounds. His blood sugar was 386. His A1C was 7.5. For a while, Luthmann was doing well. Now, he seems to be reversing.[1]

---

[1] Luthmann hasn't been able to see doctors in months because his primary care physicians stopped taking Obamacare. He switched to a new group, but his "intake appointment" is still weeks away.

On August 5, 2021, Luthmann's period of BOP custody ended, and Luthmann's term of Supervised Release began.    According to Judge Weinstein's Order, Luthmann's term of Supervised Release is scheduled to end on August 4, 2024.

On March 4, 2022, this matter was opened in the Middle District of Florida under a Transfer of Jurisdiction. See **EXHIBIT "F."** The Transfer of Jurisdiction states:

> IT IS HEREBY ORDERED that, pursuant to 18 U.S.C. 3605, the jurisdiction of the probationer or supervised releasee named above be transferred with the records of this Court to the United States District Court for the Middle District of Florida upon that Court's order of acceptance of jurisdiction. This Court hereby expressly consents that the period of probation or supervised release may be changed by the District Court to which this transfer is made without further inquiry of this court.

Luthmann has been looking for work. Luthmann's physical, mental, emotional, and legal disabilities are hamstringing his ability to get work.

Luthmann is on Obamacare and collects food stamps. He lives on the charity of his family. If he didn't have his family, he would be out on the street and homeless.

Luthmann has lost contact with much of his family and friends. He was not allowed visits while incarcerated because of Covid-19 since 2020. Luthmann has remained in the Middle District of Florida since his release from federal prison in 2021. Luthmann tried to get permission to go to the East Coast of Florida to see friends and family for Thanksgiving 2022, but that became too much of a hassle with US Probation. Now, Luthmann wants permission to travel for six days to Chicago on March 17 – 23 to see friends and family there – at their expense – and US Probation denied this request. See **EXHIBIT "G."**. Luthmann feels he has lost contact with civil society. He

---

When he asked for a closer appointment and told about his diabetes concerns, all the receptionist says was, "find someone else with a closer appointment." Luthmann can't find anyone else.

feels he is relegated to the sub-human class and still-existing American slavery by operation of the Thirteenth Amendment and the US Probation regulations. He cannot fully embrace his human dignity until his term of supervision ends.

Despite these things, Luthmann has tried to better himself and remain upbeat. He has exhibited extraordinary rehabilitative efforts.  He has been admitted as a member of the National Writers Union. See **EXHIBIT "H."**

Luthmann has published numerous articles in several forums, many as an intern for the Frank Report (www.frankreport.com) and his Substack (luthmann.substack.com).  Hopefully, this will one day turn into paid work.

He joined the Knights of Columbus and attained third-degree status within the organization, a recognized religious order of the Catholic Church. See **EXHIBIT "I."** Luthmann is a Sunday altar server at Saint William Church in Naples, FL. See **EXHIBIT "J."**

Luthmann has been clean and sober since he went to prison and embraces a sober lifestyle.

Luthmann is recognized as disabled under Florida law and has a pending federal disability claim.

For the combination of these reasons, Luthmann files the instant application.

**Physical, Emotional, and Psychological Disability**

Luthmann has severe physical, mental, and emotional limitations. Luthmann is disabled under Florida law. See **EXHIBIT "K."** Luthmann has a federal disability application pending with the Fort Myers Social Security Disability Office.  See **EXHIBIT "L."** That determination is contingent upon the court's legal decisions, as outlined *infra*.

Judge Weinstein recognized Luthmann's mental and emotional limitations in his Statement of Reasons in United States v. Luthmann.  Judge Weinstein found that Luthmann had long suffered

6

from mental issues. These mental and emotional problems were confirmed by Luthmann's records and medications within the Federal Bureau of Prisons and continue to the present day.

Luthmann is actively treating his mental health issues at the David Lawrence Center in Naples, Florida. The current diagnosis has the indicia of Bipolar II Disorder. Luthmann's provider has recently changed, and the facility has indicated they may reevaluate his diagnosis altogether.

Today, Luthmann is much improved and has many of the proper medications, tools, and knowledge of his condition. He is at a stable point in his mental health, and he is trying to take things forward cautiously. To the extent the Court requires further personal medical information and/or confidential records, Luthmann would be happy to provide the same. Luthmann has provided the same to the Disability Office regarding a disability claim under Federal law.

Luthmann has two replaced hips and the physical body of a 77-year-old man. In addition to mental and emotional issues, Luthmann is physically disabled under Florida law with diabetes, obesity, hypolipidemia, sleep apnea, and severe orthopedic problems. **M."**

### Sentencing Disparity

This case has a sentencing disparity, as recognized under 18 U.S.C. § 3553(a)(6). The attached EDNY docket shows both Luthmann co-Defendants, George Padula and Michael Beck, received only two (2) year terms of Supervised Release. They were involved in a crime of violence involving a handgun. Padula received 60 months imprisonment from the Court (mandatory minimum for the firearm) and a two (2) year term of Supervised Release.

Luthmann received only a 48-month term of imprisonment and a three (3) year term of Supervised Release for non-violent crimes.

Luthmann believes the Court should end Luthmann's term of supervision. At a minimum, Luthmann believes the sentencing disparity forms a legal basis to reduce his term of supervision

to two (2) years in line with the terms of his co-defendants, whose conduct was violent and much more serious. Anything short of that sends a message that violent crimes are not serious.

### Evidence of Government Misconduct and Declaration of Actual Innocence

Luthmann recently filed a Notice and Declaration in Reservation of Rights of Richard Luthmann with Respect to Evidence of Unprecedented Governmental and Prosecutorial Misconduct with the Clerk of Court in the Eastern District of New York. The filed document is based on several essential facts showing extraordinary and unprecedented misconduct, the destruction of evidence, and a cover-up by FBI Special Agent Paul Tambrino, Lead Prosecutrix Moria Kim Penza, and others working on behalf of the Government of the United States. Luthmann details the irregularities and misconduct therein. See **EXHIBIT "N."**

These facts include the litigation currently pending in the US District Court for the Eastern District of New York related to the matter of United States v. Raniere, 18-CR-204 (NGG) (VMS), (E.D.N.Y.), and in the US Court of Appeals for the Second Circuit in the matter of United States v. Raniere, No. 20-3520 (2d Cir. 2022). Moria Kim Penza was Lead Prosecutrix in both cases. The filed document declares Luthmann's actual innocence:

> 41.     I am actually innocent of all the charges against me. The entire indictment was a political contract and "hit-job," instituted by a bent Acting US Attorney seeking to curry political favor for her soft landing into private practice and pressed forward by career-advancement-hungry Prosecutrix, whom I believe cheated and violated the US Constitution to secure my conviction.
>
> 42.     The Plea Colloquy also establishes my actual innocence of the Government's charges.   Once the *Raniere* proceedings have run their course, I intend to file a comprehensive motion. But in short, at the Plea Colloquy and again at Sentencing, the Court accepted an insufficient factual allocution to justify the crimes pleaded to. Concerning the wire fraud, I stated that I

*represented clients who had committed fraud.* I never said I was part of the fraud or made any criminal agreement.

43.     Moreover, the Plea Colloquy does contain a sufficient allocution to the extortionate credit conspiracy. The Magistrate Judge was even unsure from his statements from the bench.

44.     I reserve the right to address all the issues raised herein upon the resolution of critical issues by the courts.

Additionally, Luthmann was convicted of the New York State "felony" of Free Speech. The prosecution was in violation of the Interstate Agreement on Detainers Act. It premised upon an indictment secured by multiple felonies by an incompetent Special Prosecutor and the perjury of a New York State Supreme Court Justice. Luthmann seeks vindication in that case as well. See **EXHIBIT "O."** Further, Mr. Luthmann may be required to travel and remain in New York to defend/resolve this state case, pending in the New York State Supreme Court Appellate Division: Second Department.

**Indigence and Inability to Pay Restitution**

Mr. Luthmann is indigent. If it weren't for his parents and family's support, Mr. Luthmann would now be homeless. He is unable to make monthly restitution. His expenses far outstrip his income, the only source of which is $250.00 monthly in EBT payments (food stamps).

In the PSR and at sentencing, Judge Weinstein recognized that Luthmann did not have any assets nor the ability to pay a fine.

Mr. Luthmann's parents are now senior citizens living on a fixed income and cannot afford to support Mr. Luthmann and pay fines. The imposition of mandatory payments threatens to make Mr. Luthmann a ward of the state because Mr. Luthmann cannot pay and has no legitimate way to earn a living right now.

**Travel, Work, and Restitution Issues**

The travel-based restrictions incident to supervised release keeps Luthmann from getting work and paying restitution.

**Job in Journalism**

One of the reasons why Frank Parlato cannot put Luthmann on payroll and why Luthmann remains an unpaid intern with the Frank Report is that Luthmann can only travel within the Middle District of Florida. See **EXHIBIT "P."**

The USPO has denied Luthmann's travel requests because Luthmann doesn't have money to pay restitution. Mr. Parlato would require Luthmann to go to the Southern District of Florida to collaborate with him at his base of operations. Additionally, Parlato has jobs in Los Angeles, California, Nashville, Tennessee, and South Carolina (among other places) that would be paid work for Luthmann if he could travel. But the USPO says no.

Luthmann can only pay restitution if he gets work. And Luthmann can only get work if he can hit the pavement the way he knows how.

### Travel to Search for Opportunity and Re-Acclimate to Society

Moreover, aside from the unconstitutionality of the travel-based restrictions, they are antithetical to proper penological purposes in Luthmann's case. Luthmann went to Columbia University and was a connected person for many years before his arrest. Luthmann intended to visit Chicago to see family and visit with friends, some of whom he intended to schmooze for potential work. Luthmann lived and worked in Miami for five years and has a Rolodex full of contacts. But he is precluded from taking the hour-and-a-half ride to see if there are opportunities there. Luthmann knows no one in Southwest Florida to leverage for opportunities.

The US Probation Office needs to realize that Luthmann is not coming out of pocket and spending money he would otherwise have available to pay towards restitution in requesting travel. Luthmann has plane tickets to Chicago and tickets to Broadway shows bought by others that are ready to be given to him to help him re-acclimate to civilized society. The goodwill of others pays for these trips. Luthmann has sat around like a lump on a log since December 15, 2017. If needed, Luthmann will keep his head down and remain a lump on a log (probably collecting federal disability) until August 4, 2024 – and beyond. But what penological purpose does that serve?

Luthmann wants to avoid picking a fight with the USPO. He dealt with years of retaliation while in the custody of the BOP. But, penologically, this makes no sense. Luthmann can't go to a Broadway show in Chicago or tour the Edgewater section of that town where notable persons like Hillary Clinton hail from, while others are paying the bill to help Luthmann get back into the world? But it'sOKe for Luthmann to see where the statute of Robert E. Lee once stood in Fort Myers or stick around Immokalee any weekend and gamble on the dog and cock fights that might

pop up behind a random dumpster fire? What "world" does the USPO want Luthmann to gravitate towards? There is only one "world" that ensures warm bodies are being fed into the Prison-Industrial-Complex and keeps them paid.

**Potential Work: Legal Research and Writing for Lawyers**

Mr. Lawrence P. Almagno, Jr., an attorney with offices in Rhode Island, Massachusetts, and New York, wrote a letter supporting Mr. Luthmann. See the attached **EXHIBIT "Q."** Mr. Almagno's letter said:

> The late Judge Weinstein, one of the greatest legal minds in recent memory, believed that there were conditions under which Mr. Luthmann could be employed as a non-lawyer assistant.   Judge Weinstein also saw that Mr. Luthmann owed over $1 million in debts, including to the Federal Government and the State of New York. Judge Weinstein recognized that Mr. Luthmann may very well go to waste if he did not have something to do with himself. And on top of the restitution and monies owed that may never be repaid, Mr. Luthmann has a very good chance of being a ward of the state for the remainder of his life.  He is now aged forty-three.

Luthmann has offers to work as a legal researcher for lawyers if the travel and the supervised release issues relating to protecting the attorney-client privilege and the attorney work-product privilege are resolved. See **EXHIBIT "R."**

Additionally, Lawrence Almagno wants to fly Luthmann up to the Northeast to give him some work to do. There was too much red tape for Luthmann to visit Mr. Almagno at Thanksgiving 2022 in Del Ray Beach. Luthmann can only make opportunities for himself if he is present in the scene of the opportunity.

The restrictions on Luthmann's travel are anti-penological. Ayn Rand said:

> "The man without a purpose is a man who drifts at the mercy of random feelings or unidentified urges and is capable of any evil, because he is totally out of control of his own life. In order to be in

> control of your life, you have to have a purpose-a productive
> purpose."

All Luthmann asks the Court for is a chance to reclaim a productive purpose in his life. Once

Luthmann has a purpose, he can be productive, a large part of this being the payment of restitution.

### Extraordinary Rehabilitation

Luthmann has achieved exceptional things above and beyond the requirements of

Supervised Release that justify consideration.

Luthmann has become a bonafide journalist and has been accepted into the union as a

member of the National Writers Union,

Luthmann has published numerous articles in several forums, many as an intern for the

Frank Report (www.frankreport.com) and his Substack (luthmann.substack.com). Hopefully, this

will one day turn into paid work.

Since his release, Luthmann has been initiated as a member of the Knights of Columbus

and has completed his Third Degree.

Luthmann has also become an Altar Server at Saint Williams Church in Naples, Florida.

Luthmann has also been clean and sober since he went to prison and embraces a sober

lifestyle.

### LEGAL ARGUMENT

#### 1. Questions About the Choice of Law

Under the transfer order, the MDFL has the authority to interpret the provisions of, modify,

and terminate my Supervise Release *sua sponte* or upon a motion:

> IT IS HEREBY ORDERED that, pursuant to 18 U.S.C. 3605, the
> jurisdiction of the probationer or supervised releasee named above

13

> be transferred with the records of this Court to the United States District Court for the Middle District of Florida upon that Court's order of acceptance of jurisdiction. This Court hereby expressly consents that the period of probation or supervised release may be changed by the District Court to which this transfer is made without further inquiry of this court.

A legal issue is still not addressed, whether Second Circuit or Eleventh Circuit law applies. It is my position that the law of the Second Circuit applies to the entire Judgment and thus to determinations regarding supervision based on conflicts of law principles.

Whether a probationer possesses a liberty interest in the *situs* of their probation jurisdiction appears to be an issue that the United States Supreme Court has never clarified. The Ninth Circuit dealt with the issue in United States v. Ohler, 22 F.3d 857, 858 (9th Cir. 1994). There, Ohler could not cite a statute or rule conferring any right upon him regarding *the location* of his probation jurisdiction.

Neither the Second Circuit of the Eleventh Circuit has ruled on this issue. One District Court case in each circuit has considered Ohler, and each only tangentially. United States v. Baadhio, No. 3:08-CR-14 (VLB), 2012 U.S. Dist. LEXIS 203017 (D. Conn. Dec. 3, 2012); Steiger v. United States, No. 2:19-CV-613-WKW, 2019 U.S. Dist. LEXIS 156373 (M.D. Ala. Sep. 13, 2019).

My argument is not under Ohler. I have no problem with the location of my probation jurisdiction being in the Middle District of Florida.

My concern is that I have a right to have the law of the Judgment in my case applied to my case, in this case, Second Circuit law. Just because my *supervision* was transferred under 18 U.S.C. § 3605, that does not mean that the legal jurisdiction of the underlying case was moved as well.

14

If this matter were a civil matter, when a case is transferred under 28 U.S.C. § 1404(a), it is well settled that courts routinely apply the choice of law rules of the jurisdiction from which the case was transferred. See, e.g., Ferens v. John Deere Co., 494 U.S. 516, 523, 110 S. Ct. 1274, 1279, 108 L. Ed. 2d 443 (1990); Piper Aircraft Co. v. Reyno, 454 U.S. 235, 243 n. 8, 102 S. Ct. 252, 259 n. 8, 70 L. Ed. 2d 419 (1981); Van Dusen v. Barrack, 376 U.S. 612, 639, 84 S. Ct. 805, 821, 11 L. Ed. 2d 945 (1964); James Ventures, L.P. ex rel. Alpert v. Timco Aviation Servs, Inc., 315 F. App'x 885, 888 (11th Cir. Feb. 27, 2009) Roofing & Sheet Metal Serv., Inc. v. La Quinta Motor Inc., 689 F.2d 982, 991 (11th Cir. 1982).

Here, the Eastern District of New York Court is the transferer court, and the Middle District of Florida Court is the transferee court. Accordingly, the Middle District of Florida Court should apply the Eastern District of New York's substantive law, the law of the Second Circuit Court of Appeals, because it is the law that would have been applied if there had been no transfer of venue for supervision. See Van Dusen, 376 U.S. at 641, 84 S. Ct. at 821.

The issue is essential factually as well.  Concerning my changed circumstances, I have been trying to become an investigative journalist.  I was recently admitted into the National Writers Union.  While this is a matter of some significance, it would have great importance in the neighborhood where I grew up in the EDNY, Florida is a "right to work" state.  I would be prejudiced if the Court did not apply a body of law that took into account all of the facts and circumstances of my conditions and gave me the benefits that I would otherwise receive under the jurisdiction where the judgment was rendered. As stated below, this fact and others may become significant under a motion under 18 U.S.C. § 3583(e)(1) to terminate or otherwise modify my term of Supervised Release.

I seek the District Court's direction on this irregular and complex issue of first impression in this Circuit.

2. **Termination of Supervised Release Term**

I intend to ask the Court to Terminate/Modify my term of Supervised Release.

The Court may terminate a term of supervised release and discharge a defendant "at any time after the expiration of one year of supervised release . . . if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." 18 U.S.C. § 3583(e)(1); see United States v. Lussier, 104 F.3d 32, 36 (2d Cir. 1997) (holding that according to section 3583(e), a district court may permit the early discharge of a defendant from supervised release "in order to account for unforeseen circumstances").

Early discharge is appropriate to "account for new or unforeseen circumstances" not contemplated at the initial imposition of supervised release. See Lussier, 104 F.3d at 36.

A district court may discharge a defendant and terminate a term of supervised release "at any time after the expiration of one year of supervised release . . . if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice." 18 U.S.C. § 3583(e)(1). In making such a determination, a court is to consider the purposes of sentencing referenced in 3583(e)(1), which include: (A) the nature and circumstances of the offense and the history and characteristics of the defendant; (B) the need for the sentence imposed to afford adequate deterrence to criminal conduct; (C) the need to protect the public from further crimes of the defendant; (D) the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (E) applicable guidelines or policy statements issued by the Sentencing Commission; and (F) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found

guilty of similar conduct. *See* 18 U.S.C. §§ 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7). Retributive punishment is irrelevant to termination or modification of supervision and is not to be considered in this context. *See* 18 U.S.C. § 3583(e)(1) (omitting reference to § 3553(a)(2)(A)).

Unforeseen circumstances may arise when the defendant exhibits "exceptionally good behavior" that would "render a previously imposed term or condition of release either too harsh or inappropriately tailored to serve the general punishment goals." *Id.* (construing § 3583(e)(2)).

District courts retain authority under 18 U.S.C. § 3583(e) to terminate a term of supervised release early in the interest of justice. *Lussier*, 104 F.3d at 36. Changed circumstances that justify early termination include a defendant's exceptionally good behavior that makes the previously imposed term of supervised release "either too harsh or inappropriately tailored to serve" general punishment goals. Id. This determination is within the discretion of the district court. Id.

The outright termination of my Supervised Release best serves the interests of justice.

First and foremost, I have a legal reason for the Court to consider: sentencing disparity under 18 U.S.C. § 3553(a)(6). As you can see from the attached EDNY docket, my co-Defendants, Padula and Beck, received only two (2) year terms of Supervised Release. They were involved in a crime of violence involving a handgun. Padula received a 60-month term of imprisonment from the Court. I received only a 48-month term of imprisonment and a three (3) year term of Supervised Release.

This is an apparent sentencing disparity that the Court can address with its broad powers under 18 U.S.C. § 3583(e)(1). For example, early termination power exists even when a mandatory minimum is required. *See* United States v. Trotter, 321 F. Supp. 3d 337, 360 (E.D.N.Y. 2018); United States v. Spinelle, 41 F.3d 1056, 1060 (6th Cir. 1994) ("[W]e hold that a district

17

court has discretionary authority to terminate a term of supervised release after the completion of one year, pursuant to 18 U.S.C. § 3583(e)(1), even if the defendant was sentenced to a mandatory term of supervised release under 21 U.S.C. § 841(b)(1)(C) and 18 U.S.C. § 3583(a)."); United States v. McClister, *No. 02-CR-87, 2008 U.S. Dist. LEXIS 2809, 2008 WL 153771 (D. Utah Jan. 14, 2008)* (same); United States v. Macklin, No. 95-CR-11, 2009 U.S. Dist. LEXIS 70051, 2009 WL 2486336 (E.D. Mo. Aug. 11, 2009) (same); U.S. Sentencing Commission, Federal Offenders Sentenced to Supervised Release, at 35 (July 2010) ("[E]arly terminations may occur even in cases where a statute originally required the sentencing court to impose a term of supervised release in excess of one year.").

Additionally, I have achieved exceptional things above and beyond the requirements of Supervised Release that justify consideration. As stated above, I have been accepted as a member of the National Writers Union and published numerous articles in several forums. Hopefully, this will one day turn into paid work.

Since my release, I have been initiated as a member of the Knights of Columbus and completed my Third Degree.  I have also become an Altar Server at Saint Williams Church in Naples, Florida.

Also, there are limits inherently imposed by supervised release terms. I can only function as support staff in a law office if the attorney-client privilege and attorney work product privilege effectively extend to protect my legitimate labor.

Similarly, I cannot effectively function as an investigative journalist if I cannot effectively assert the reporter's privilege and assure would-be sources that their information given in confidence will not be later divulged by way of a Government search or seizure.  I believe that the assertion of the reporter's privilege by an individual on Supervised Release concerning the terms

18

of supervision is also a novel issue of first impression in both the Second and Eleventh Circuits. I have not found any cases on this issue.

Hopefully, the Court can consider these factors along with the extraordinary terms of the Judgment drafted by Judge Weinstein and my physical, mental, and emotional limitations, and terminate my time of Supervised Release.

The Court should also consider the purposes of sentencing in 18 U.S.C. § 3553(a).

Section 3553(a)(1), the nature and circumstances of the offense detail a non-violent offense fueled by drugs, alcohol, stress, and mental illness. Luthmann has been clean from drugs and alcohol for years and is living a sober life. Luthmann is no longer a lawyer, nor does he hold any position of public trust or stress. And Luthmann's mental illnesses have been identified and are being properly addressed and treated. Luthmann shows no propensity towards violence, nor is he ever likely to be in a situation where he could commit the crimes of conviction ever again.

The defendant's characteristics include an individual with serious physical, mental, emotional, and legal disabilities. Mr. Luthmann is doing his best to deal with the physical, mental, and emotional issues. As said above, Mr. Luthmann is non-violent. Mr. Luthmann will also retain the "felon" tag. Mr. Luthmann was also formerly a very gifted person. If given the opportunity, he may become a productive member of society again. This factor favors termination of supervised release.

Section 3553(a)(2)(B) discusses general and specific deterrence. The penological goals are satisfied. Mr. Luthmann has been removed from the position of trust, a predicate for these offenses. Moreover, the harshness of Mr. Luthmann's sentence and the onerous collateral consequences of conviction serves as a general deterrent to any would-be offenders. This factor favors termination of supervised release.

Section 3553(a)(2)(C) discusses the need to protect the community. Mr. Luthmann is not dangerous. The crimes of conviction are non-violent. He has a spotless record while in the BOP. He is now a member of the Knights of Columbus and an altar server at the local church. Mr. Luthmann is not dangerous. This factor favors termination of supervised release.

Section 3553(a)(2)(D) discusses the need for requisite medical care or vocational training. Mr. Luthmann's medical conditions are managed and can only be enhanced by termination from supervised release. With respect to vocational training, Mr. Luthmann cannot be an effective journalist or legal researcher/employee for a law firm while on supervised release because of the mirky legal issues involved. This factor favors termination of supervised release.

Section 3553(a)(4),

Section 3553(a)(5) talks about applicable Policy Statement recommendations of the United States Sentencing Commission. Here, the standard condition of release, U.S.S.G. § 5D1.3(c)(1), normally ensures that defendant's sentence is roughly uniform and proportionate when compared to the sentences of other persons with similar backgrounds who have been found guilty of similar conduct. However, Judge Weinstein's statements and modifications to the judgment show that Luthmann's situation is so far afield of others that few will have "similar backgrounds" with Luthmann, and few will have engaged in "similar conduct." Judge Weinstein wanted to allow Luthmann to make restitution someday by specifically stating he could work for lawyers as a legal researcher and writer. This factor favors termination of supervised release.

Section 3553(a)(6) discusses sentencing disparities. As stated above, Luthmann, the non-violent offender, received a three-year supervised release term. Luthmann's co-defendants, who pleaded to crimes of violence, both received two-year terms. This factor favors the termination of Luthmann's supervised release.

Section 3553(a)(7), the need to provide restitution to the victims of the offense, squarely favors termination of supervised release. Mr. Luthmann is not going anywhere, and the Mandatory Victims Restitution Act provides collectability against Mr. Luthmann for the next twenty years. Endorsing ableism and removing legal impediments that will open up work opportunities are squarely beneficial to the victims of the offense, who are the ultimate beneficiaries. These opportunities are necessary to ensure the repayment of restitution.

Moreover, as stated *infra.*, denying Luthmann's present application for termination of supervised release only makes Luthmann's case for permanent Social Security Disability that much stronger. The existence of legal disabilities to gainful employment must be taken into account in the SSDI analysis. *See* 20 C.F.R. §§ 404.1594(c)(2), 416.994(b)(iv), 404.1545, 416.945, 404.1520a, and 416.920a.

Finally, the supervision of Mr. Luthmann is optional to ensure that he makes as much satisfaction of his debts as possible. The Government has plenty of enforcement mechanisms outside of supervised release. This factor favors the termination of Luthmann's supervised release.

Accordingly, the motion of the defendant, Richard Luthmann, to be discharged from supervised release pursuant to Fed. R. Crim. P. 32.1 and 18 U.S.C. § 3583(e)(1) should be GRANTED.

### 3. Modification of Supervised Release Terms and Conditions To Account For Physical, Mental, and Legal Disabilities Surrounding Employment and Other Issues

Suppose the Court does not see fit to terminate Luthmann's term of supervised release. In that case, the Court should consider the term of Supervised Release and/or, more specifically, tailor the provisions to Luthmann's particular facts and circumstances.

If employment in a law office or as a journalist is problematic, can Luthmann have gainful employment while under supervision?  The only other skill Luthmann has is credit repair, an unregulated industry.  Luthmann could set up as a credit repair consultant.

But if the USPO finds the other work problematic, then this work would surely be so because the first thing Luthmann would ask for from a potential client is a copy of a recent credit report.  Plus, it will be challenging to find clients if Luthmann is compelled to disclose that the Federal Government can look at their client files at any time without any prior notice or any subpoena that may be quashed.

Under the Thirteenth Amendment, as long as Luthmann is supervised, the choices are not his. The Thirteenth Amendment textually allows for involuntary servitude – the corollary of slavery - of those convicted of crimes. Luthmann understands that.

The Thirteenth Amendment reads: "Section 1. Neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within   the   United   States,   or   any   place   subject   to   their   jurisdiction. Taylor v. Georgia, 315 U.S. 25, 27 n.3, 62 S. Ct. 415, 416 (1942).

Luthmann believes implications of the right to travel and due process are implicated in his case.  Luthmann believes the Fourteenth Amendment's ratification supersedes travel restrictions that may be imposed on those subject to other forms of involuntary servitude under the Thirteenth Amendment short of actual imprisonment.

The Due Process Clause of the Fourth and Fourteenth Amendments and a multitude of Federal laws, including but not limited to the Americans with Disabilities Act, explicitly supersedes the involuntary servitude provisions of the Thirteenth Amendment and the legal

support for specific conditions of Supervised Release. Due Process provides that Luthmann cannot be compelled to work if Luthmann is disabled, even as part of supervision.

Luthmann wants to work, if possible, at an appropriate job. Luthmann is making bonafide, good-faith efforts to do so. See United States v. Baldwin, No. 20-12993, 2021 U.S. App. LEXIS 20553, at *12 (11th Cir. July 12, 2021). However, to get work, Luthmann must be able to travel.

The right of interstate travel is constitutionally protected, does not necessarily rest on the Fourteenth Amendment, and is assertable against private and governmental interference. Griffin v. Breckenridge, 403 U.S. 88, 89, 91 S. Ct. 1790, 1792 (1971). The right to pass freely from state to state is among the rights and privileges of national citizenship and, like other rights of national citizenship, is within the power of Congress to protect by appropriate legislation. Id.

The US Supreme Court has firmly established that the right of interstate travel is constitutionally protected, does not necessarily rest on the Fourteenth Amendment, and is assertable against private and governmental interference. Shapiro v. Thompson, 394 U.S. 618, 629-631;id., at 642-644 (concurring opinion); United States v. Guest, 383 U.S. 745, 757-760 and n. 17; Twining v. New Jersey, 211 U.S. 78, 97; Slaughter-House Cases, 16 Wall. 36, 79-80; Crandall v. Nevada, 6 Wall. 35, 44, 48-49; Passenger Cases, 7 How. 283, 492 (Taney, C. J., dissenting). (The "right to pass freely from State to State" has been explicitly recognized as "among the rights and privileges of national citizenship.")

Here, Luthmann reports specific instances when the travel-approval process has had a substantial negative effect on his job and work prospects. Luthmann sought and was denied approval for essential business travel. Luthmann cannot be held to make restitution payments where the Government is a substantial factor in enhancing the effects of Luthmann's legal disabilities causing Luthmann not to obtain paid work. The Court has enough information to find

23

the tangible and intangible impact Luthmann's lost potential opportunities due to being unable to travel without supervision.

The rehabilitative value of is substantial. Travel restrictions are impeding Luthmann's work. Because travel would allow him to work and earn monies towards his restitution payments, early discharge from supervised release, or termination the standard travel restrictions would serve appropriate purposes of sentencing and be in the interest of justice.

4. **Protecting a Potential Law Firm Employer's Attorney-Client Privilege and Work Product Privilege**

During a term of supervised release without specific and narrowly-tailored limitations, Luthmann cannot function as support staff in a law office if the attorney-client privilege and attorney work product privilege do not effectively extend to protect Luthmann's legitimate labor.

The standard terms of supervised release must yield to the language US District Court Judge Jack B. Weinstein stated explicitly in the Judgment: "The defendant is permitted to assist attorneys with legal work but not as an attorney."

5. **Protecting the First Amendment Privilege to Engage in Newsgathering**

The Court should address additional concerns about Luthmann's activities as an aspiring journalist and the interplay between the terms of Supervision and the First Amendment's free press clause. This is squarely important to Luthmann's ability to engage in newsgathering and assert the journalist's source privilege.

The qualified reporter privilege, established by the United States Supreme Court in Branzburg v. Hayes, 408 U.S. 665, 33 L. Ed. 2d 626, 92 S. Ct. 2646 (1972) allows reporters to be free from disclosing information about sources. Courts have recognized

this privilege because of society's interest in the First Amendment guarantee of freedom of the press. People will more freely give information to reporters on a promise of confidentiality when they know that such a promise will not be broken. This trust that reporters can establish with informants leads to the free flow of information to the public. A betrayal of such confidence between a reporter and his source could undermine the First Amendment's protection of the free press. *Id.*

Luthmann cannot effectively function as an investigative journalist if he cannot effectively assert the reporter's privilege and assure would-be sources that their information given in confidence will not be later divulged by way of a Government search or seizure. The assertion of the reporter's privilege by an individual on Supervised Release concerning the terms of supervision is also a novel issue of first impression in both the Second and Eleventh Circuits. We0 have not found any cases on this issue.

To be clear, Luthmann has been establishing his bonafides as a journalist. He has written several articles for The Frank Report (www.frankreport.com). He is learning as an unpaid intern from Frank Parlato, an investigative reporter, journalist, publisher, and media consultant for over forty years. His published work to this point has qualified him for membership in the National Writer's Union. Luthmann has enclosed his official union listing. Luthmann's writing is focused on criminal justice, investigative journalism, and political satire.

### 6. Disabilities Surrounding Employment

If employment in a law office or as a journalist is problematic, Luthmann needs to see how he can gain gainful employment while under supervision. The only other skill Luthmann has is credit repair, an unregulated industry.

Luthmann could easily set up as a credit repair consultant.  But if the USPO finds the other work problematic, then this work would surely be so because the first thing Luthmann would ask for from a potential client is a copy of a recent credit report.  Plus, it will be complicated to find clients if Luthmann is compelled to disclose that the Federal Government can look at their client files at any time without prior notice or any subpoena that may be quashed because he is under federal supervision.

But to the extent that Luthmann has legal disabilities, these disabilities must be known before, and are squarely relevant to a Social Security Disability Determination. Luthmann has an SSDI Determination upcoming.

One question the SSDI Administrative Law Judge will raise is: Does the individual have the ability to do past relevant work?

Here, Luthmann's "ability" is limited by physical, emotional, psychological, and legal factors. If Luthmann's supervised release is terminated, there are more legal activities he may properly and gainfully perform.

At the Past Relevant Work step, the SSA determines the claimant's residual functional capacity (RFC). The RFC is basically what a person can still do despite their physical or mental impairments. 20 C.F.R. §§  404.1594(c)(2), 416.994(b)(iv), 404.1545, 416.945. *See also* SSR 96-8p. The claimant has the burden of proof at this stage. Gray v. Heckler, 760 F.2d 369 (1st Cir. 1985). The SSA compares the individual claimant's RFC with the functional requirements of the individual's past relevant work as customarily performed in the economy. 20 C.F.R. §§ 404.1546, 416.946.

Past relevant work usually means work performed in the last fifteen years. 20 C.F.R. §§ 404.1565, 416.965; SSR 82-61 (Past Relevant Work--The Particular Job or Occupation Generally Performed).

Work performed sporadically or for too short a period to have learned the job may not be past relevant work. *See* SSR 82-62. In a 2003 decision, <u>Barnhart v. Thomas</u>, 124 S. Ct. 376 (2003), the Supreme Court ruled that at this step there is no requirement that the claimant's previous work still exist in the national economy. In other words, a claimant will be found not disabled at step 4 if she or he retains the ability to return to a job that is obsolete or no longer exists.

Another question in the SSDI Inquiry is: Does the individual have the ability to perform other work?

At this final step in the sequential analysis, the SSA determines whether the claimant can perform other work that exists in the regional or national economy, considering his or her RFC and vocational factors, i.e., age, education and literacy, and work history. If there are other jobs that exist in significant numbers in the regional economy, disability benefits will be denied. If such other jobs do not exist, benefits will be paid. 20 C.F.R. §§ 404.1560, 416.960.

To make this determination, the SSA first looks to the medical-vocational guidelines, also known as the "grids," at 20 C.F.R. Pt. 404, Subpt. P, App. 2. 20 C.F.R. §§ 404.1569, 416.969. The grids are a set of three matrices, based on defined exertional capacities for sedentary, light, and medium work, designed to match the availability of significant numbers of jobs with the claimant's physical RFC, age, education and literacy, and work history. SSR 83-10 (Titles II and XVI: Determining Capability to Do Other Work--The Medical-Vocational Rules of Appendix 2).

The exertional levels are defined at 20 C.F.R. §§ 404.1567, 416.967. The age criteria are defined at 20 C.F.R. §§ 404.1563-68, 416.963-68. The rules for applying the grids are found in

Section 200 of Appendix 2 to Subpart P of Part 404. If the applicant's impairments are exertional only, the grids are determinative of disability or nondisability at step 5. Exertional impairments basically result in limitations in the ability to perform the "strength" demands of jobs. 20 C.F.R. §§ 404.1569a, 416.969a.

The grids do not apply to nonexertional impairments. Nonexertional impairments are impairments that interfere with an individual's ability to work whether or not they are exerting themselves, e.g., mental impairments, skin and sensory impairments, pain, and fatigue. If the individual's impairments are all nonexertional, the SSA must perform an individualized determination at this step. SSR 85-15 (Titles II and XVI: Capability to Do Other Work--The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments).

If the claimant's impairments are both exertional and nonexertional, the SSA may first look to the grids to see whether the claimant can be found disabled on his or her exertional impairments alone. If not, the SSA must consider the degree to which the nonexertional impairments diminish the claimant's capacity for work that he or she could otherwise do considering his or her exertional capacity, age, education, and work history. 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); SSR 83-14 (Capability to Do Other Work--The Medical-Vocational Rules as a Framework for Evaluating a Combination of Exertional and Non-exertional Impairments).

If the claimant's occupational base is significantly eroded by non-exertional impairments or if the claimant's impairments are solely non-exertional, the SSA must make an individualized determination at this step, using the appropriate regulations. *See* Ortiz v. Sec'y, 890 F.2d 520 (1st Cir. 1989).*See also* SSR 96-9p (Determining Capability to Do Other Work--Implications of a Residual Functional Capacity for Less Than a Full Range of Sedentary Work). As the grid rules

are quite rigid, it is usually beneficial to determine whether the claimant has non-exertional impairments that can be documented in order to get an individualized determination at this step.

Luthmann would like to embrace ableism and get his life on track. However, if the applicable rules state that he can do nothing other than apply for and then collect federal disability benefits until my term of supervision expires on August 5, 2024, he understands that is the Government's prerogative. There was no real work in prison during COVID-19, and given his limitations, he has not been able to work for the past five years. Moreover, there are many jobs Luthmann cannot do because of the physical and mental requirements.

Please know Luthmann wants to try to take appropriate productive part-time work given his needs and limitations and work past my disabilities, physical, mental, emotional, and legal.

Luthmann wants the opportunity to contribute to society with legitimate labor, grow as an individual, and meet my obligations, including restitution.

**CONCLUSION**

For the reasons stated above, the Court should grant Mr. Luthmann's application and terminate his supervised release. In the alternative, the Court should modify the terms and conditions of supervised release as herein stated.

Dated: Naples, Florida
      February 9, 2023,

Respectfully submitted,

Richard Luthmann
Defendant *Pro Se*
338 Sugar Pine Lane
Naples, FL 34108
(239) 631-5957

29

FILED

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA** 2023 FEB -9  AM 11: 23

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

------------------------------------------------------------

UNITED STATES OF AMERICA,                          2:22-cr-0021-SPC-NPM

       -against-

RICHARD LUTHMANN,

              Defendant.

------------------------------------------------------------

## **CERTIFICATION OF SERVICE**

    RICHARD LUTHMANN, of full age and sound mind, declares as follows under the

penalties of perjury contained in the US Code:

    1.    I am the Defendant in the above-captioned matter.

    2.    I served the following parties with a copy of the enclosed Notice of Motion,

Declaration of Richard Luthmann with exhibits, and Memorandum of Law by hand delivering the

papers to the person at the address designated by them for that purpose as indicated below:

    Clerk of Court
    U.S. Courthouse and Federal Building
    2110 First Street
    Fort Myers, Florida 33901

    U.S. Attorney's Office
    2110 First Street
    Suite 3-137
    Ft. Myers, FL 33901

    U.S. Probation Office for the Middle District of Florida
    US Courthouse and Federal Building
    2110 First Street
    Suite 4-182
    Ft. Myers, FL 33901-3011

1

Dated: Naples, Florida
      February 9, 2023

Respectfully submitted,

Richard Luthmann*

*Signed under penalties of perjury contained in Title 18 of the United States Code.

2